IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

JONATHAN T. DYKES,                )
                                  )
                Plaintiff,        )
                                  )
v.                                )        No. 2:09-CV-282
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,  )
                                  )
                Defendant.        )

## MEMORANDUM OPINION

Plaintiff was born in 1985 and resides with his mother. [Tr. 149-50]. His most

recent applications for children's disability insurance and Supplemental Security Income

("SSI") benefits were filed with assistance from his mother in July 2007. [Tr. 23-24, 68-71,

172, 207]. Now before the court is an action for judicial review, pursuant to 42 U.S.C. §

405(g), of the defendant Commissioner's final decision denying plaintiff's claims. For the

reasons that follow, defendant's motion for summary judgment [doc. 17] will be granted, and

plaintiff's motion for summary judgment [doc. 10] will be denied.

I.

*Procedural History*

The applications presented to the Commissioner claim that plaintiff is disabled

by attention deficit hyperactivity disorder ("ADHD"), manic depression, foot problems,

morbid obesity, knee pain, back pain, hypertension, and "emotional instability." [Tr. 159,

201]. A disability onset date of February 22, 2006, is alleged. [Tr. 196]. Plaintiff's applications were denied initially and on reconsideration. He then requested a hearing, which took place before an Administrative Law Judge ("ALJ") in November 2008.

In March 2009, the ALJ issued a decision denying benefits. He concluded that plaintiff suffers from "obesity, a genetic foot deformity . . . , ADHD, borderline intellectual functioning, and a bipolar disorder," which are "severe" impairments but not equal, individually or in concert, to any impairment listed by the Commissioner. [Tr. 12-13]. The ALJ found plaintiff to have the residual functional capacity ("RFC") for medium exertion with certain occasional postural limitations and "the mental restrictions of can perform [sic] simple, routine, repetitive work that allows for occasional public contact." [Tr. 14].[1] Relying on vocational expert ("VE") testimony, the ALJ determined that plaintiff remains able to perform a significant number of jobs existing in the national economy. [Tr. 19]. Plaintiff was accordingly deemed ineligible for benefits.[2]

Plaintiff then sought, and was denied, review by the Commissioner's Appeals Council, notwithstanding his submission of 38 pages of additional records. [Tr. 1, 4].[3] The

---

[1] Of particular relevance to this appeal is the following statement made by the ALJ at the administrative hearing: "I'll be honest with you . . . reading the record his problem is living at home. If he moved out to get away from his mother he'd be better off." [Tr. 54].

[2] Plaintiff does not challenge the ALJ's conclusions pertaining to his alleged *physical* disabilities. Those conditions will therefore receive minimal discussion herein. Plaintiff's family circumstances, however, require a fairly substantial amount of discussion as they were a central factor considered by the ALJ in his ruling.

[3] Plaintiff's additional documents [Tr. 796-834] are not discussed in his brief and are thus (continued...)

ALJ's ruling then became the Commissioner's final decision, *see* 20 C.F.R. §§ 404.981, 416.1481, and this timely appeal followed. *See* 42 U.S.C. § 405(g).

On appeal, plaintiff argues that the ALJ did not sufficiently credit his alleged limitations in maintaining attention and performance and in dealing with stress. Further, plaintiff appears to accuse the ALJ of harboring bias against him individually and/or against all Social Security claimants in general.

## II.

### *Background*

Plaintiff participated in special education classes during high school, later obtaining a GED. [Tr. 357, 555, 754]. He then achieved a "Combination Welder Diploma" at the Tennessee Technology Center. Plaintiff's treating psychologist described that diploma as follows:

> He earned a Combination Welder Diploma which, according to the list of graduates, the minority [of] the students in the welding program earned. That is, most of them earned certificates that qualified them to do only one type of welding while [plaintiff's] diploma represented an ability to do all primary types of welding. In addition, he had a framed certificate that represented his ability to read blueprints.

[Tr. 387]. There was then apparently an opportunity for plaintiff to use his welding skills at a job in Virginia. [Tr. 386, 388]. However, "[h]is mother . . . learned that the setting would not be good for him being there with a lot of 'mean' people on that worksite." [Tr. 388].

---

[3](...continued)
not an issue on appeal. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006).

The mother has advised the Commissioner that plaintiff's "psychological problems and emotional problems started around 6 years old. He has to have constant assurance that I love him many times a day. He is mentally behind in age and his maturity. His psychologically body [sic] has remaind [sic] at backward and nieve [sic]." [Tr. 167].

Following a telephonic interview with the Commissioner in July 2007, the interviewer noted,

> [Plaintiff] required assistance from mother yet he would correct her on things. [I]nterview began with [plaintiff] only on telephone then [mother] took over when [plaintiff] needed assistance. . . . [Mother] stated [plaintiff]/her son can do simple, repetitive tasks but cannot function independently therefore there is not an employer that will keep him [because] he [can't] do anything without constant supervision and instruction and encouragement.

[Tr. 198].

The mother completed plaintiff's "Disability Report - Appeal" form, writing in material part,

> . . . His chief problem is mental. He is borderline retarded; immature with not much chance of maturing past the mental age of 15 yr. old. He has tried to work 3 different times, but has been unsucessful [sic] keeping any job because of his inability to make production; and comprehend normal instructions pertaining to the job performance. He has problems with understanding verbal and written communications; due to the nature of Bi Polar and Retardation he thinks he can do it, but in reality he has proven he cannot. He has been unsuccessful at general and romantic relationships. . . . Academically he is at a loss. Socially handicapped. . . . He has no self confidence in some things and too much in others.
>
> . . . He can function in a repetative [sic] and controlled environment, but if there is a deviation, his lack of reasoning skills leaves him confused and unsure of himself. . . .

. . . Since he has proven he can't successfully work without one on one guidance; [sic] he needs this disability and medical insurance to receive the proper treatment he needs for Bi Polar - Manic Depression, [sic] condition and hypertension.

There is no way he could complete these forms. He had no clue. I, his mother, filled them out.

[Tr. 245-46].

At the administrative hearing, plaintiff was asked by his attorney about the "problems at home between you and your mother."

Q: What's that situation now?

A: I throw fits and I throw stuff, I have a temper.

Q: And what brings these on?

A: My bipolar and manic depression.

[Tr. 30]. Plaintiff's mother purports to live in fear of his "angry, out-of-control behaviors." [Tr. 388]. A treating psychologist has opined that one "primary" cause of plaintiff's "bad moods" is the fact that he "goes to bed too late." [Tr. 384].

It has been represented on plaintiff's behalf that his daily activities consist of, "Get up and go to bed at various [times], watch t.v., sit around, light household chores. Sleep." [Tr. 208, 215]. Plaintiff stands 5'4" tall, weighs approximately 300 pounds, and eats what a treating physician has described as a "poor diet" that "his mother prepares." [Tr. 409]. He purportedly "does nothing much but sit around[,] watch TV and eat." [Tr. 409, 736]. However, the record indicates that he is capable of operating a riding lawnmower, cooking,

shopping, dating, riding a dirt bike, changing a litter box, checking his cat's blood sugar, attending church, deer hunting, driving, running track, weightlifting, turkey hunting, helping a friend with a newspaper route, woodworking (including making a rocking chair), working as a "gopher" for the volunteer fire department, traveling "out of town on a camping trip," and performing housework [Tr. 209-12, 287, 358, 375, 382, 433, 762, 771, 777], although it is represented that he needs his mother's encouragement to perform some of these undertakings. [Tr. 210].[4] Plaintiff has a driver's license [Tr. 294], and at the time of his administrative hearing was working part-time as a security guard. [Tr. 33].

III.

*Relevant Evidence*

A. <u>Administrative Record</u>

When plaintiff was eight years old, his mother sought psychiatric evaluation for him, purportedly at his teachers' request. [Tr. 547]. She told social worker Janet Grindstaff that plaintiff exhibited <u>no</u> indication of suicidal ideation. [Tr. 548]. Plaintiff saw psychiatrist Albert Sprinkle the following month. Dr. Sprinkle wrote, in total contrast to what the mother had recently told Ms. Grindstaff, that "[t]he precipitating factor for referral seems to be for the past two months [plaintiff] has been making comments about wanting to

---

[4]    Regarding plaintiff's need for maternal encouragement, the records of a treating psychologist mention a two-week period in which the mother stayed with her daughter-in-law because of her older son's arrest. The psychologist noted, "Interestingly, [plaintiff] and his step-father got along quite well, and the boy [plaintiff was 20 years old at the time] was relatively responsible in keeping chores done, much more so than when his mother is home." [Tr. 385].

kill himself, and this has gotten the mother scared enough that she has sought psychiatric care." [Tr. 545]. Dr. Sprinkle's initial impressions were ADHD and depression. [Tr. 546].

In 1996, school psychologist Carole Fuller generated a psychological evaluation report. Testing indicated that plaintiff was "functioning in the borderline range of cognitive ability. This may be a low estimate of [his] actual ability." [Tr. 541]. Plaintiff was thought to have ADHD, and classroom observations were consistent with that diagnosis. [Tr. 534-35, 541].

Plaintiff and his mother attended counseling sessions with Dr. Sprinkle in 1996 and 1997. The mother reported that plaintiff would exhibit "loud, threatening outbursts" when limits were set. [Tr. 529-30]. There were, however, "[n]o complaints from school." [Tr. 529].

Psychologist Edward Latham evaluated plaintiff in 1997. The diagnosis was "borderline deficient in his intellectual potential. He also shows clearly has [sic] an attention deficit and is impulsive in responding." [Tr. 526].

Psychiatrist I.N. Kutty conducted at least four sessions in 1999 and 2000, apparently with both plaintiff and his mother. [Tr. 258-66].[5] Dr. Kutty's handwritten notes are difficult to read, but nonetheless a tremendous amount of conflict between the parent and child is apparent.[6] Dr. Kutty wrote that plaintiff's diagnosis is "unclear." [Tr. 260]. At the

_____

[5] Plaintiff would have been 14 to 15 years old at this time.

[6] The administrative record also evidences significant domestic conflict between plaintiff
(continued...)

final appointment on June 21, 2000, Dr. Kutty discontinued plaintiff's medications, noting that he "behaves well outside, acts out at home." [Tr. 258].

In 2001, school psychologist Fuller generated another psychological evaluation report. Test results showed plaintiff to be "within the borderline to deficient range of cognitive ability." [Tr. 555]. Three different persons observed plaintiff during three different classes. They described him as "well-mannered and behaved, shows good effort . . . pays attention and works hard . . . friendly, well-spoken . . . has good relationships with peers and is willing to participate." [Tr. 554].[7]

Plaintiff, accompanied by his mother and stepfather, underwent an intake interview at Holston Counseling Center in January 2002. Attending social worker John Singleton described plaintiff as "present[ing] as a very immature 16 year old boy, who speaks in a juvenile manner, and responds in childish ways to the environment." [Tr. 279]. Mr. Singleton recommended both individual and family therapy. [Tr. 275]. Plaintiff attended one further session, at which he reported "get[ting] along well at home and school" despite being "angry about his diet" [Tr. 278], but neither he nor his mother appeared for any further appointments. [Tr. 277].

---

[6](...continued)
and his older stepbrother, who makes unannounced "stays for relatively long periods of time" in the family's "relatively small house." [Tr. 213, 379, 382-84, 386]. Plaintiff was noted to be "in better spirits and more relaxed" during a period in which the stepbrother was incarcerated. [Tr. 383].

[7] Similarly, school records describe plaintiff at age 18 as "a very well mannered and sociable young man. He has lots of friends and fits in well." [Tr. 755].

In April 2002, plaintiff and his stepfather were seen by nurse practitioner Kristi Cook. Ms. Cook wrote, "According to stepfather and [plaintiff], he is doing very, very well" thanks to anti-anxiety and ADHD medications. [Tr. 672]. Conversely, in September 2002, plaintiff's mother advised Dr. Richard Gendron that the ADHD medication "has not helped" [Tr. 669], but it was further revealed that the stepbrother had stolen plaintiff's medications. [Tr. 668]. In May 2003, Dr. Gendron observed that plaintiff "expressed some real abnorm[al] bonding with mother while in room . . . wide swings between independence and severe depend[e]nce." [Tr. 647]. The following month, Dr. Gendron noted a "[m]ajor confrontation with mother and extr[]eme anxiety at her departure. Immature soci[al]ly and challenged and responds aggressively to t[e]asing and tantrums with mom and step dad." [Tr. 643].

On Dr. Gendron's recommendation, clinical psychologist Latham performed another evaluation in August and September 2003, interviewing both plaintiff and his mother. [Tr. 289]. Dr. Latham noted prior diagnoses of ADHD and bipolar disorder. [Tr. 289]. Plaintiff had recently "been experiencing problems in maintaining his anger and has been untruthful in interactions with his mother." [Tr. 289].[8] Dr. Latham noted that recently plaintiff "drew back his hand to hit his mother but did not do so. He has also become aggressive with his stepfather. *His mother reports she is the only individual with whom he has been aggressive, and he does not show a pattern of aggression at school*." [Tr. 289]

---

[8] Plaintiff was 17 years old at the time.

(emphasis added). Testing indicated that plaintiff's intellectual functioning was "borderline deficient." [Tr. 290]. A depression inventory questionnaire suggested, in Dr. Latham's opinion, that plaintiff's "tolerance for stress is significantly reduced even for routine, daily stressors." [Tr. 290]. Dr. Latham did not find "evidence of a pervasive development[al] disorder with this patient." [Tr. 291]. After reviewing Dr. Latham's "moderate workup," treating physician Gendron opined that plaintiff's "big[g]est problem is [his] harass[]ment and inap[p]rop[]riate bonding to his mother with very negative outburst." [Tr. 630].

Clinical psychologist Steven Lawhon evaluated plaintiff in August 2004. Despite having a driver's license, plaintiff was driven to the appointment by his mother. [Tr. 374]. Dr. Lawhon did not find evidence to support a diagnosis of bipolar disorder. [Tr. 375]. Dr. Lawhon further found "no evidence of mental retardation and the claimant appears to be functioning at least in the borderline range of intelligence. He was rational, oriented, and did not display evidence of a thought disorder." [Tr. 375]. Vocationally, Dr. Lawhon predicted only that plaintiff would be "mildly limited" in persistence and sustained concentration. [Tr. 376].

Dr. Samuel Breeding performed a physical consultative examination in September 2004. Dr. Breeding described plaintiff as a "pleasant" young man appearing to have "average to slightly below" average intelligence. [Tr. 294-95].

Plaintiff visited Dr. Larry Foster in January 2005 for a "sleep consultation." Dr. Foster described plaintiff as exhibiting "symptoms of possible severe sleep apnea." [Tr.

324].  Dr. Foster scheduled further testing.  [Tr. 324].  He later wrote that "[t]he family subsequently canceled the study and have not returned phone calls to reschedule to the study."  [Tr. 319].

Clinical psychologist Lawhon evaluated plaintiff again in January 2006.  Despite having a driver's license, plaintiff was again driven to the appointment by his mother.  [Tr. 356].  Dr. Lawhon wrote in material part,

> . . . His mother stated that she thought he was hearing voices.  However, the claimant denied this. . . .
>
> . . . without further testing, the current symptoms presented do not support a diagnosis of bipolar disorder.  The claimant's intellectual functioning is estimated to be in the borderline range.  He was rational, oriented, and did not display evidence of a thought disorder.

[Tr. 357].  As to work-related impairment, Dr. Lawhon opined only that plaintiff would be "mildly" limited in adaptation, persistence, and sustained concentration.  [Tr. 359].

The administrative record evidences eight appointments with clinical psychologist Gary Wishart in 2005 and 2006 for what appears to have been a hybrid of individual and family counseling.  According to Dr. Wishart's notes, a recurring theme of plaintiff's therapy was "the importance of respecting his mother and treating her nicely."  [Tr. 382-83, 385, 388].  The first appointment with Dr. Wishart was an intake interview secondary to referral "by his physician, Dr. Suresh Nekuri, and by his mother because of problems with mood disorder."  [Tr. 379].  Dr. Wishart's report from that day focuses largely

on the mother's subjective reporting.[9]

Although Dr. Lawhon had twice suggested that plaintiff does not suffer from bipolar disorder, Dr. Wishart diagnosed that condition disorder in reliance on "Mother's completion of a Bi-Polar Symptom Checklist [which] far exceeded the number of items necessary to consider a problem in that area." [Tr. 380-81]. Dr. Wishart additionally noted that, "[d]espite being of borderline intelligence according to parental reports, he graduated high school, and currently attends Tennessee Technology School where he is studying welding." [Tr. 379]. Nonetheless, Dr. Wishart concluded,

> It is this examiner's opinion that [plaintiff] will likely be dependent on his family much of his life given his low intellectual, academic, and executive functioning. It is recalled that his intelligence is lower than 95% of the population and that his reading skills fall at the third grade level. This is in addition to significant bipolar disorder and social immaturity. His psychological functioning is very vulnerable, leaving him at risk for significant upset in relatively minor stressful situations.

[Tr. 384].

In February 2006, Andrew Phay completed a Psychiatric Review Technique form. [Tr. 360-73].[10] Dr. Phay opined that plaintiff is no more than mildly limited in maintaining concentration, persistence, or pace. [Tr. 370].

---

[9] Dr. Wishart later wrote, "One gets the impression that this family is overwhelmed and disorganized, making it difficult for them, especially mother, to attend sessions reliably." [Tr. 386].

[10] Plaintiff correctly points out that this form does not indicate that the completing source is a psychologist. [Tr. 360]. However, the court takes judicial notice of the Tennessee Department of Health's website, which shows that Dr. Phay has been licensed as a clinical psychologist since at least 1985. *See* Tenn. Dep't of Health: Licensure Verification, http://www.health.state.tn.us/Licensure/default.aspx (last visited Dec. 29, 2010).

In 2006 through 2008, plaintiff attended a handful of sessions with psychiatrist Eric Moffet. Dr. Moffet's notes are handwritten and generally illegible. He predicted that plaintiff's concentration and interaction with others "warrant psychiatric evaluation." [Tr. 704]. However, the mental status checklist portions of Dr. Moffet's records are consistently unremarkable. [Tr. 707-08, 711, 714, 775, 778, 780]. Dr. Wishart was critical of the treatment relationship with Dr. Moffett due to a purported lack of input from plaintiff's mother. [Tr. 388-89]. The administrative record, however, shows at least six communications from the mother to Dr. Moffet's office. [Tr. 709-10, 713, 777]. For example, on April 9, 2007, the mother called to advise that plaintiff "[a]ct[s] like a woman on PMS." [Tr. 709].[11]

Following a January 2, 2007 appointment, treating physician Paul Provance noted that plaintiff had recently gotten a job. [Tr. 397]. Dr. Provance described plaintiff as, "Alert and oriented. Pleasant and cooperative with exam. Speech fluent and coherent. Mood and affect congruent. Fund of knowledge appropriate for the conversation." [Tr. 398]. An August 22, 2007 appointment with Dr. Provance was, according to the physician, a "visit today without his mother which is the first time since I have been seeing him." [Tr. 771, 773]. Plaintiff was content, alert, and oriented with normal mood and affect. [Tr. 772]. He described bedtime anxiety "because his father and brother often fight." [Tr. 771].

---

[11] Plaintiff was 21 years old at this time.

13

Nonexamining psychological examiner Rebecca Joslin completed a Mental RFC Assessment in September 2007. Dr. Joslin opined that plaintiff would be no more than moderately limited in any vocational category, including concentration and persistence. [Tr. 731-32].

Dr. Krish Purswani performed a physical consultative examination in November 2007. Plaintiff was accompanied by his mother. [Tr. 735]. Dr. Purswani opined, in material part, that plaintiff is capable of managing his own affairs. [Tr. 738].

B. Vocational and Medical Expert Testimony

Dr. Thomas Schacht testified as a medical expert at the administrative hearing. Dr. Schacht testified that plaintiff's mental health records were "notable for a long pattern of discrepancy" between the subjective complaints presented by plaintiff and his mother versus plaintiff's behavior at school and the "objective behavior observed by clinicians." [Tr. 36]. Dr. Schacht opined that plaintiff's mental status examinations, which he termed "the only objective data that we have," were normal. [Tr. 47]. Dr. Schacht further stated,

> Dr. Cutty was, as far as I can tell, the only practitioner in this record who really looked at the big picture and said wait a minute there's a big discrepancy here between what I'm being told about this person by the family and what I'm learning at the school and what I'm seeing in front of me.

[Tr. 47-48]. In sum, Dr. Schacht stressed that the subjective complaints of plaintiff (largely presented through his mother) are more severe that what is supported by the objective evidence of record.

Dr. Norman Hankins then provided VE testimony. The ALJ presented a hypothetical claimant of plaintiff's age, education, and work history. The claimant would be capable of medium exertion with occasional postural limitations restricted to "simple, routine, repetitive work with occasional public contact." [Tr. 56]. In response, Dr. Hankins identified 5,500,000 jobs existing in the national economy that the hypothetical claimant could perform. [Tr. 56-57]. In response to questioning from plaintiff's counsel, the VE added that if the hypothetical claimant was either incapable of tolerating even low stress jobs *or* had "significant problems with concentration and continuous past performance," all employment would be precluded. [Tr. 59-60].

IV.

*Applicable Legal Standards*

Review of the Commissioner's decision is confined to whether the ALJ applied the correct legal standards and whether his factual findings were supported by substantial evidence. 42 U.S.C. § 405(g)*; Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative

15

decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

A claimant is entitled to disability insurance payments if he (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1). "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423 (d)(2)(A).[12]  Disability is evaluated pursuant to a five-step analysis summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

---

[12] A claimant is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. 42 U.S.C. § 1382. "Disability," for SSI purposes, is defined the same as under § 423. 42 U.S.C. § 1382c(a)(3).

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters*, 127 F.3d at 529 (citing 20 C.F.R. § 404.1520).  Plaintiffs bear the burden of proof during the first four steps.  *Walters*, 127 F.3d at 529.  The burden shifts to the Commissioner at step five.  *See id.*

V.

*Analysis*

Plaintiff argues that the ALJ erred in not finding him to be significantly limited in sustained attention and performance.  Plaintiff further contends that he is unable to perform even low stress jobs.   Lastly, plaintiff appears to accuse the ALJ of harboring "a general bias against Social Security claimants."  The court will address these issues in turn.

A. Stress, Sustained Attention, and Performance

The administrative record overflows with evidence of domestic conflict. Numerous examples of that conflict have been cited herein.  Within the home, or within therapy sessions dominated by the mother, plaintiff is described as "socially handicapped," "out of control," clueless, "childish," responding aggressively to parental teasing, "act[ing]

like a woman on PMS," and incapable of working with "mean" people. Conversely, outside of the mother's dominion plaintiff is described as "well-mannered and behaved," relatively responsible, "sociable . . . [with] lots of friends," and "doing very, very well."

The record presented to this court exceeds 830 pages, and the evidence presented to the ALJ approached 550 pages. Dr. Kutty cogently wrote that plaintiff's diagnosis is "unclear." The court finds that in restricting plaintiff to simple, low-stress, repetitive tasks, the ALJ reasonably synthesized the myriad opinions presented to him. The substantial evidence standard of review recognizes an ALJ's "zone of choice" in such circumstances. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).

The ALJ credited plaintiff's diagnoses of minimal intelligence, ADHD, and bipolar disorder. The existence of those conditions, however, does not necessarily mean (as argued by plaintiff) that he is significantly limited in concentration and performance or that he cannot handle stress *at all*. While Dr. Latham predicted "significantly reduced" stress tolerance and Dr. Wishart (in a setting focused largely on the mother) predicted a "risk for significant upset in relatively minor stressful situations," other examining or treating sources such as Dr. Lawhon did not. Although Dr. Moffet wrote that plaintiff's concentration "warrant[ed] psychiatric evaluation," the legible portions of his therapy notes are unremarkable. Other sources, such as Drs. Lawhon, Phay, and Joslin, clearly did not feel that plaintiff's concentration and performance are limited beyond the accommodations set forth by the ALJ.

Dr. Kutty's observation that plaintiff "behaves well outside, acts out at home" well-summarizes the 834-page administrative record. Treating physician Gendron has opined that plaintiff's "big[g]est problem is [his] harass[]ment and inap[p]rop[]riate bonding to his mother with very negative outburst." Medical expert Dr. Schacht testified that plaintiff's mental health records were "notable for a long pattern of discrepancy" between the subjective complaints presented by plaintiff and his mother versus plaintiff's behavior at school and the "objective behavior observed by clinicians." [Tr. 36]. Dr. Schacht deemed Dr. Kutty "the only practitioner in this record who really looked at the big picture and said wait a minute there's a big discrepancy here between what I'm being told about this person by the family and what I'm learning at the school and what I'm seeing in front of me."

Plaintiff has obtained his GED and drivers license. He has earned a welding and blueprint accreditation more advanced than most of his classmates. These accomplishments support the ALJ's conclusion (as echoed by Drs. Kutty, Schacht, and Gendron) that plaintiff can perform, attend, and deal with stress at a higher level than is alleged. The court finds no error in the ALJ's RFC determination.

## B. Bias

The court must also address plaintiff's allegation that "statements at the hearing appear to reflect bias on the part of the ALJ." Plaintiff, through counsel, presents a string cite of quotes regarding prejudice, partiality, and "general bias against Social Security claimants."

The allegation of bias stems from an exchange between plaintiff's attorney and the ALJ during Dr. Shacht's testimony, after the ALJ had allegedly "cut off" attorney. Counsel's questioning of Dr. Schacht spans 15 pages of the administrative hearing transcript. [Tr. 40-54]. For the first four of those pages, counsel questioned the medical expert in an argumentative fashion, attempting to characterize plaintiff as someone who is unable to afford medical care. [Tr. 40-43]. Given that plaintiff is able to (1) afford up to two packs of cigarettes per day while smoking "like a freight train" [Tr. 408, 762] and (2) pursue the diet supplement Hydroxycut [Tr. 417], counsel's line of questioning fails the straight face test.

The last six pages of counsel's questioning involved plaintiff's Bender Gestalt test results. [Tr. 49-54]. After a rather lengthy answer from Dr. Schacht, the following exchange took place between the ALJ and plaintiff's attorney:

ALJ: Have we beaten this dead horse, can we move on?

. . .

ALJ: I'll be honest with you, Counsel, this whole thing and reading the record his problem is living at home. If he moved out to get away from his mother he'd be better off. I'm going to talk with our good friend [the VE] over there. Do you have any problem with Dr. Hankins' credentials?

ATTY: I do not, Your Honor. But I would like to ask Your Honor if we have already decided the case before we have talked to Dr. Hankins?

ALJ: No, I never decide a case until I finish everything.

ATTY: Okay. I just wanted to make sure.

ALJ: Have I not heard all the evidence anyway?

ATTY: Before we were cut off I think you heard most of it.

ALJ: You weren't cut off, Counsel. And you know you weren't cut off.

ATTY: I think we could develop also the sleep apnea issue as far as if there is cognitive functioning impairments [sic] there, but Dr. Schacht did briefly discuss it.

ALJ: No, you've had it. . . .

[Tr. 54-55].

It is unclear how counsel hoped to further develop the sleep apnea issue. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation omitted). As counsel recognized, Dr. Schacht had already testified, "So to any extent that there is a component of cognitive impairment here it could be due to sleep apnea that's apparently being untreated." [Tr. 38]. However, as Dr. Schacht further observed, the alleged condition is untreated because "the family canceled the [sleep apnea] study" and would not return phone calls to reschedule. [Tr. 38, 319]. There does not appear to be any further point that counsel could have made on this issue, because a claimant who does not follow "prescribed treatment without a good reason" is not disabled. *See* 20 C.F.R. § 416.930(b).

Regardless, the court has reviewed the administrative hearing transcript and finds no indication of bias. It appears that plaintiff is bothered by the ALJ's observation that

"his problem is living at home.  If he moved out to get away from his mother he'd be better off."  As cited throughout this opinion, substantial evidence abundantly supports the ALJ's observation.  Plaintiff's bias argument is without merit.

VI.

*Conclusion*

The court sympathizes with the distress caused by plaintiff's family dysfunction.  However, domestic turmoil does not alone make a claimant disabled under the Social Security Act.  The ALJ accommodated plaintiff's limitations in a manner supported by substantial evidence.  The Commissioner's final decision must therefore be affirmed.  An order consistent with this opinion will be entered.

ENTER:

    s/ Leon Jordan
United States District Judge